Filed 3/4/24  P. v. Ervin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081105 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CS313050) |
| JURON DWITTY ERVIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Enrique E. Camarena, Judge.  Affirmed.

Elisa A. Brandis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Daniel Rogers and Vincent Paul LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juron Dwitty Ervin of robbery (Pen. Code,[1] § 211). The trial court sentenced him to a one-third midterm prison term of one year consecutively to a separate term, ordering him to pay a $200 section 1202.4, subdivision (b) fine and staying a $200 section 1202.45 fine. On appeal, Ervin contends the court abused its discretion when it denied his motion for new trial in which he argued the court improperly excluded testimony of a doctor relevant to his defense of involuntary intoxication, which Ervin claimed was caused by a prescribed medication. He alternatively contends his counsel was prejudicially ineffective for failing to hire an expert witness on the medication and its potential side effects. He further contends the court improperly instructed the jury regarding involuntary intoxication and unconsciousness as a complete defense. Ervin argues the cumulative effect of these errors prejudiced him such that we should reverse the judgment. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*People's Evidence*

On January 30, 2020, Ervin walked into a Chula Vista bank with a skateboard and backpack and approached a teller who offered to assist him. The first thing he told the teller was that he wanted to go home and asked for the nearest bus station. Ervin's body language seemed abnormal to the teller; he was just staring at her, he seemed "lost" or "a little off," and he "just didn't seem there." Another customer gave Ervin directions to the nearest bus stop. About a minute later, Ervin leaned toward the teller and said, "I am robbing the bank. Give me all your hundreds." The teller was able to clearly understand him; he was speaking calmly and coherently. She gave Ervin $5,500 in hundred dollar bills. Ervin did not use a weapon.

---

[1]     Undesignated statutory references are to the Penal Code.

2

Another teller felt it was strange that Ervin stood not saying anything after they had assisted him; when she saw him slowly reach into his backpack, she put her finger on the silent alarm, then pressed it when she saw Ervin lean over the barrier to the other teller to say he was robbing the bank. Ervin, whose demeanor was serious, calmly left the bank.

A responding police officer stopped Ervin in the bank's shopping center after seeing he matched the suspect's description. Ervin had a large amount of cash, all of the hundred dollar bills he had taken, in his hand.

*Ervin's Testimony*

Ervin testified at trial. He denied committing the robbery, saying he did not recall telling the teller "this is a robbery," was not feeling well at the time, and had a "like a blackout moment" while at the teller counter. Ervin testified he was homeless and living at a downtown shelter but was an engineering student at Southwestern College at the time of the incident. According to Ervin, he had opened an account at the bank that went inactive, and had reopened the account about a week before January 30. On the day of the robbery, he had taken both of his daily medications for high blood pressure and migraines, but started to feel unwell, experiencing nausea and double vision. He felt he was suffering side effects from taking the medications together, which he usually did not do. Ervin thought he should eat so he went to the bank to withdraw money. Ervin testified that inside, he was stuttering, could not breathe, and felt he was going to pass out at the counter. He was slurring his words and could not get out what he was trying to say. He received money and walked out of the bank, experiencing "low key hallucinations" and "confused with what was all going around me at the time." He decided to roll his skateboard out into the traffic to see if cars would swerve around it, but a car hit and broke it. According to Ervin, this

told him "what was going on with me was real." Two to three minutes after he left the bank, Ervin realized he had the sum of money in his hand. He started walking back to the bank but was stopped by police.

*Evidence Code Section 402 Hearing*

During trial, the court conducted an Evidence Code section 402 hearing on whether to admit testimony from Dr. Robert Searles, who had worked as an attending physician at St. Vincent de Paul's medical clinic. Dr. Searles testified based on his review of defense-provided medical records that he had treated Ervin on January 3, 2020. He testified that on that day, Ervin was seen for migraines and prescribed Depakote. Dr. Searles testified he had a long history of prescribing Depakote and medications in that class, and was familiar with common and uncommon side effects of that drug. Some of the uncommon side effects included hallucinations and psychosis, as well as aggression and hostility. The records showed Ervin discontinued the medication on January 13, 2020. The court excluded as irrelevant Dr. Searles's opinion about whether Ervin had a particular mental state on the day of the robbery. Dr. Searles confirmed that the medical records did not show Ervin suffered any effects of being angry, violent, or acting on dangerous impulses due to the drug. He also confirmed he was not testifying about Ervin's mental state on the day of the robbery.

During argument on the admission of Dr. Searles's testimony, defense counsel acknowledged Dr. Searles could not comment on Ervin's behavior on the day of the robbery, but argued his testimony was pertinent to Ervin's honesty: "So the purpose of his testimony would be to shine light on a fact that Mr. Ervin's testimony will—I guess, I should say Mr. Ervin will testify and the doctor's testimony will clarify a fact which I otherwise anticipate the People would attack, which is whether or not Mr. Ervin is being honest about

4

whether or not he was prescribed this medication. So it's for the purpose of clarifying the testimony of my client and describing whether or not these side effects exist." Counsel continued: "And . . . because one of the side effects is that somebody may act on a dangerous impulse, that is relevant to my arguments to the jury. And it's relevant to the jury's understanding of my client and the medicines that he took on that date."

The trial court excluded Dr. Searles's testimony, finding any testimony about aggression or hostility not relevant to intent to deprive, the mental state for robbery.[2]

Defense counsel continued to argue that excluding Dr Searles's testimony eliminated Ervin's defense, and offered to clarify her position in chambers: "[T]here are arguments to be made about whether or not acting on a dangerous impulse could vitiate the necessary intent required for this case, if the court were to exclude it they would be effectively obliterating a defense that Mr. Ervin is constitutionally entitled to have. He's entitled to put on a defense. And this is a specific intent crime. And the court by deciding whether or not my arguments are correct about whether or not it applies to the specific kind of intent that is required in this case is the court making a determination that the jury should make, and I think that would be reversible error." The court again ruled there was no relevance. It stated,

---

[2] The court reasoned: ". . . I think I mentioned this before, robbery has a specific intent to deprive. So anything that affects Mr. Ervin's mental state has to be relevant to the specific intent to deprive, not the use of violence. So any testimony about aggression or hostility that is caused by a medicine is inappropriate and excluded. [¶] The question is: Is the testimony from Dr. Searles that highly and probable or a common side effect of psychosis or acting on a dangerous impulse [*sic*]? And I don't know what that means because it wasn't defined for me in this hearing whether that is sufficient to have any relative [*sic*] to the mental state. Based on the state of the evidence I cannot so find."

"[A]cting on a dangerous impulse has no bearing on the intent to deprive. . . . And even more so, this was, essentially, a nonviolent robbery. So acting on a dangerous impulse, if that relates to violence, I think there is less of a connection here." The parties moved on once defense counsel tried to clarify that her argument was not about violence but "relates as to whether or not Mr. Ervin committed an act that he otherwise wouldn't when he was not under the influence of an intoxicating substance." The court reiterated there was no connection between Ervin's symptoms and the legally required mental state.

*Jury Instructions*

Following the close of evidence, the court instructed the jury on voluntary intoxication: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to permanently deprive the owner of his or her property. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing it could produce an intoxicating effect or willingly assuming the risk of that effect."

The court also instructed the jury that as to robbery or its lesser included crimes, the People had the burden of proving beyond a reasonable doubt that Ervin acted with the intent to permanently deprive the owner of his or her property, and, "If the People have not met this burden, you must find the defendant not guilty of robbery, grand theft and petty theft."

*Defense Closing Argument*

During closing argument Ervin's counsel emphasized that the "largest issue" was the issue of Ervin's intent. She told the jury that the evidence showed Ervin acted "in a state of crisis"; in what he described as a "blackout"

6

or "psychosis" that was impacted by the medications that he took on that day. She asked the jury to consider the voluntary intoxication instruction: "The voluntary intoxication instruction is included in your packet. The People have argued that you can disregard it. I'm arguing that you should not. And that is because it's relevant to your determinations as it relates to whether or not Mr. Ervin had the intent to permanently deprive the bank of the money. His testimony is: That he took the medication and then he started acting weird in a way that he never had before. And because you have that information, you can use it to assist you in determining whether or not Mr. Ervin formed the necessary intent. [¶] The People have the burden of proving that Mr. Ervin had the intent to permanently deprive [the bank]. And if they have not met that burden because of this information, you must find Mr. Ervin not guilty."

*Motion for New Trial*

Ervin later unsuccessfully moved for a new trial on the ground the court erred by excluding Dr. Searles's testimony. Asserting the People's case rested entirely on his own statements and actions, Ervin argued the doctor's testimony concerning the type of medication Ervin had been prescribed and the medication's side effects would have "assist[ed] the jury in understanding . . . Ervin's actions and state of mind at the time of this incident." In a declaration submitted in connection with a request for juror information, Ervin's counsel averred that after the verdict one juror stated the jury was unable to consider Ervin's prescription drugs and their effect on state of mind " 'without more information.' " The trial court denied the motion on the same grounds it had excluded Dr. Searles's testimony.

## DISCUSSION

### I. *Denial of New Trial Motion*

Ervin contends the court erred by denying his motion for new trial. He maintains its exclusion of Dr. Searles's testimony deprived him of his constitutional right to present his only defense. In particular, pointing to the doctor's testimony about the possible side effects of the prescribed drug that he assertedly took on the day of the robbery, Ervin maintains the testimony was "clearly relevant to the issue of [his] mental capacity to commit the crime" and denied him the opportunity to present relevant evidence supporting his testimony. Ervin further contends the error prejudiced him under any standard in that it left the jury with only his own testimony regarding his prescriptions and their effect on his state of mind, which the jury rejected; he was unable to pursue a planned defense of involuntary intoxication and unconsciousness; and defense counsel was unable to argue Ervin's symptoms were known side effects of the drug, that unconsciousness from involuntary intoxication was a complete defense, or that the People had the burden to prove consciousness.

Pointing out Dr. Searles did not discuss the possibility of unconsciousness or define the terms "hallucinations" and "psychosis," the People respond that the court properly denied the new trial motion because Ervin did not offer Dr. Searles's testimony in furtherance of an involuntary intoxication defense. They point out Dr. Searles was not offered as an expert and thus did not opine on whether Ervin's conduct during the robbery was consistent with someone experiencing hallucinations or a psychotic episode. Thus, they argue, the court did not "mislead the jury on involuntary intoxication by excluding evidence not offered for that purpose . . . ." They argue the court's ruling did not prevent Ervin from asserting a defense

8

because he did not offer the evidence in support of a claim of involuntary intoxication. According to the People, the court correctly would have rejected any such defense given the absence of evidence regarding the effect of hallucinations or psychosis on Ervin's ability to form the requisite specific intent for robbery.

## A. *Standard of Review*

" ' "We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.] " 'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.' " ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 729; see also *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108.) Likewise, the court's decision to exclude evidence is committed to its discretion, so we will not disturb a lower court's decision " ' " 'except on a showing [it] exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*McCurdy*, at p. 1108.)

## B. *Ervin Has Not Demonstrated the Court Abused its Discretion*

On this record, Ervin cannot demonstrate the court manifestly abused its discretion in denying his new trial motion based on the court's exclusion of Dr. Searles's testimony, or the asserted elimination of a viable defense. Ervin's counsel did not offer Dr. Searles's testimony on a defense of involuntary intoxication or unconsciousness; counsel argued the testimony would bolster Ervin's credibility as to the medications he had taken, and the types of side-effects so as to show one side effect was that "somebody may act on a dangerous impulse . . . ." After the court made its ruling, defense counsel offered that the testimony would relate to whether Ervin "committed

9

an act that he otherwise wouldn't when he was not under the influence of an intoxicating substance." This vague and unspecific proffer did not constitute a claim that Dr. Searles's testimony would have supported a defense of involuntary intoxication or unconsciousness. Even Ervin's new trial motion did not raise any issue of unconsciousness; it merely argued the testimony about the type of medication and its side effects would have assisted the jury in "understanding . . . Ervin's actions and state of mind" during the robbery and permitted his counsel to "seek instructions, including involuntary intoxication, they otherwise would have sought."

Further, the trial court reasonably concluded by adopting its prior reasoning in ruling on the new trial motion that Dr. Searles's testimony about Depakote's uncommon side effects of hallucinations or psychosis— terms that Dr. Searles did not define or explain—had no tendency to prove Ervin lacked the requisite mental state for robbery. And because Dr. Searles was not designated as an expert, he did not testify concerning Ervin's mental state. The court thus did not abuse its discretion by concluding the testimony was not material to any defense, including involuntary intoxication or unconsciousness, that might have bore on Ervin's mental state. This evidentiary ruling did not impact Ervin's Sixth Amendment right to present a defense. Generally speaking, " 'the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) "It follows, for the most part, that the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal

10

Constitution." (*Ibid.*; see also *People v. Smith* (2017) 10 Cal.App.5th 297, 305, fn. 4.)

Finally, the court instructed the jurors on the impact of intoxication (albeit voluntary) on Ervin's mental state, and counsel argued the point to the jury, asserting that Ervin's "state . . . was impacted by the medications that he took on that day." He advanced an intoxication defense, which the jury resolved against him under correct instructions. "Although completely excluding evidence of an accused's defense" might rise to the level of a constitutional violation, preventing a defendant from presenting "evidence on a . . . subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) In sum, the record does not support Ervin's claim that the court's ruling excluding Dr. Searles's testimony violated his federal constitutional right to present a defense.

## II. *Claim of Ineffective Assistance of Counsel*

Ervin alternatively contends his counsel provided constitutionally ineffective assistance by failing to present a qualified expert regarding Depakote and its side effects. He maintains "there was simply no reason for defense counsel not to have introduced evidence of the drug's side effects or [his] lawfully obtained prescription fo[r] the drug." He relies on his new trial arguments to establish prejudice, that is, he argues it is reasonably probable absent the error he would have received a better result had he presented other more qualified witnesses regarding the drug and his prescription.

"To demonstrate ineffective assistance of counsel, [Ervin] 'must show that counsel's performance was deficient, and that the deficiency prejudiced

11

the defense.' [Citations.] On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.] '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.) In evaluating Ervin's claim, we " 'defer[ ] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.' [Citation.] Thus, defendant ' "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " ' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

Ervin cannot overcome that presumption. The decision about what witnesses should testify, including experts, is an inherently tactical decision for trial counsel. (See, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 989 [decisions about whether to call a particular witness is a matter of trial tactics and strategy " 'which a reviewing court generally may not second-guess' "].) The record does not affirmatively disclose that Ervin's counsel had no rational tactical purpose for electing to not call a qualified expert, and we are not convinced there could be no satisfactory explanation for such a decision. Dr. Searles's proffered testimony demonstrated that Depakote's side effects of psychosis and hallucinations, undefined conditions on which Ervin sought to rely, were not common. Unconsciousness or black-outs were not identified as side effects. Ervin's medical records, at least according to

12

Dr. Searles, did not show that he ever experienced anger, violence or acted on dangerous impulses due to the drug. Dr. Searles testified it would be "highly unusual" for Depakote to have an effect on someone robbing a bank. These circumstances, and the fact Ervin was able to recount what happened both immediately before and after the actual robbery and engaged in the purposeful conduct of asking only for hundred dollar bills, makes it reasonable to conclude Ervin's counsel elected to not call an expert because his or her testimony may have been unfavorable to Ervin.

And we agree with the People that Ervin could not establish prejudice in any event. The record does not disclose what expert witness Ervin's counsel would have called at trial, or what opinions such an expert would have testified to, and we "are therefore unable to infer anything about its existence, probative force, or the probable consequences at trial, had such evidence been presented." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1033.) " 'A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation" ' " as to the effect of counsel's omissions. (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549-550, quoting *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241; see also *In re Cox* (2003) 30 Cal.4th 974, 1016.)

III. *Claim of Instructional Error*

Ervin contends the trial court erred by not instructing the jury with modified versions of CALCRIM Nos. 3425[3] and 3427[4] regarding unconsciousness or involuntary intoxication. He points out the defense is recognized in situations where a defendant knowingly ingests legally prescribed medications that result in unforeseen side effects causing unconsciousness. According to Ervin, the evidence that he took his prescription drugs before the robbery, his strange behavior at the time as recounted by himself and the tellers, and the fact he made no effort to flee the scene was sufficient to require the instructions. He maintains the error is reversible per se because it prevented the jurors from considering his defense against the charges. He also maintains the error is not harmless under

---

[3]      CALCRIM No. 3425 provides that "[t]he defendant is not guilty of [a crime] if [he or she] acted while unconscious. Someone is unconscious when he or she is not conscious of his or her actions. [ ]Someone may be unconscious even though able to move." It further provides that "[u]nconsciousness may be caused by [ ]a blackout[,] an epileptic seizure [or] involuntary intoxication . . . [¶] [But t]he defense of unconsciousness may not be based on voluntary intoxication." (*Ibid.*) The instruction provides that "[t]he People must prove beyond a reasonable doubt that the defendant was conscious when [he or she] acted. If there is proof beyond a reasonable doubt that the defendant acted as if [he or she] were conscious, you should conclude that [he or she] was conscious, unless based on all the evidence, you have a reasonable doubt that [he or she] was conscious, in which case you must find [him or her] not guilty." (*Ibid.*)

[4]      CALCRIM No. 3427 provides: "Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required [intent or mental state] when [he or she] acted. [¶] A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the [force or duress or fraud or trickery of someone else], for whatever purpose[, without any fault on the part of the intoxicated person]."

14

either the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18) or *Watson* (*People v. Watson* (1956) 46 Cal.2d 818) standards of prejudice.

We cannot agree with Ervin's contentions. At trial, Ervin did not advance any defense based on involuntary intoxication or unconsciousness. He does not demonstrate whether his counsel requested such instructions. Accordingly, the court was not required to give the instructions sua sponte absent substantial evidence supporting the defense. In *People v. Saille* (1991) 54 Cal.3d 1103, the California Supreme Court stated that "[i]ntoxication is . . . relevant only to the extent that it bears on the question of whether the defendant actually had the requisite specific mental state" and thus instructions on the theory are now "more like the 'pinpoint' instructions" as to which a defendant is entitled upon request. Thus, such instructions "are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*Saille*, at p. 1119; see *People v. Rogers* (2006) 39 Cal.4th 826, 887 ["A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case"].)

Assuming Ervin's own testimony about having a blackout moment at the teller counter constitutes substantial evidence to support involuntary intoxication or unconsciousness instructions (see *People v. Rogers*, *supra*, 39 Cal.4th at p. 887 [citing case law that instruction was warranted where defendant testified he did not remember shootings and was distraught and mentally exacerbated by events before shootings]), we would conclude any

error in omitting such instructions was harmless.[5]

---

[5] Jury instruction errors are structural or reversible per se when they

In *People v. Boyer* (2006) 38 Cal.4th 412, the defendant argued that instructional error occurred because the trial court failed to instruct on the complete defense of unconsciousness. (*Id.* at p. 468.) The California Supreme Court did not address whether instructional error had occurred, finding any instructional error "was harmless by any applicable standard." (*Id.* at p. 470.) First, strong evidence suggested the defendant had killed his victims while the defendant was conscious. (*Ibid.*) Further, the jury had been instructed that voluntary intoxication warranted a verdict of involuntary manslaughter rather than murder, but it convicted the defendant of murder, found true a special circumstance allegation that rendered him eligible for the death penalty, and sentenced him to death. (*Id.* at p. 471.) "The only logical inference [was] that the jury rejected the defendant's claim of unconsciousness entirely. Hence, an instructional failure to explain the jury's duty in the event it found *involuntary* unconsciousness can have caused no prejudice." (*Ibid.*)

Here, the evidence that Ervin committed the robbery in an unconscious state is weak. His own testimony shows he recalled his actions immediately before and after the robbery, and the sole evidence of an asserted blackout moment at the teller counter was Ervin's self-serving statement. The teller described Ervin as demanding only one hundred dollar bills, volitional and purposeful conduct that contradicts any indication Ervin was not conscious of his actions. (See *People v. Haley* (2004) 34 Cal.4th 283, 313 ["a person is

---

" 'categorically " 'vitiat[e] *all* the jury's findings' " ' " (*People v. Mil* (2012) 53 Cal.4th 400, 412) and the effect on the verdict is " ' "necessarily unquantifiable and indeterminate." ' " (*People v. Aranda* (2012) 55 Cal.4th 342, 364.) Omission of the unconsciousness and involuntary intoxication instructions in this case, even if they had been required, would not rise to the level of structural error; like most instructional errors, it is not the type of error that is necessarily unquantifiable and indeterminate.

deemed 'unconscious' if he or she committed the act *without being conscious thereof*," italics added]; see also *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1315 [unconscious act is one committed by a person who is not conscious and " 'whose act therefore cannot be deemed volitional' "].) The circumstances counter any inference of unconsciousness. (Accord, *People v. Halvorsen* (2007) 42 Cal.4th 379, 418 [evidence of defendant's "actions during the course of the offenses," including "[t]he complicated and purposive nature of his conduct" did not support an inference that he was unconscious while he committed the crimes].)[6]

Further, given evidence that Ervin knowingly took his prescription medications before the robbery, the trial court instructed the jury on voluntary intoxication and its effect on Ervin's mental state, which was sufficient to apprise the jury about the relation between intoxication and Ervin's ability to form the requisite state of mind, an essential element of robbery. Thus, as in *People v. Boyer*, *supra*, 38 Cal.4th 412, the jury already considered Ervin's intoxication and asserted blackout moment in the context of his ability to formulate the specific intent required for robbery. The "only logical inference" is that the jury rejected his claim of unconsciousness entirely. (*Id*. at p. 471.) The failure to give an instruction is harmless where

---

[6] The weakness of Ervin's evidence would permit us to find no prejudice under the harmless error test of *People v. Watson* (*supra,* 46 Cal.2d at p. 836). "In evaluating what a jury is likely to have done in the absence of the error we ' "may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." [Citation.] "There is a reasonable probability of a more favorable result within the meaning of *Watson* when there exists 'at least such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error affected the result.' " ' (*People v. Speck* (2022) 74 Cal.App.5th 784, 793.)

" 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant . . . .' " (*People v. Wright* (2006) 40 Cal.4th 81, 98; accord, *People v. Lujano* (2017) 15 Cal.App.5th 187, 195-196 ["Omission of an instruction is harmless beyond a reasonable doubt if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions" ' "].)

### IV. *Cumulative Error*

Ervin contends the cumulative impact of the errors requires reversal of his convictions. Our rejection of Ervin's claims of substantive error and conclusion that any assumed error was harmless necessarily disposes of his claim of cumulative error. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818; *People v. Coulthard* (2023) 90 Cal.App.5th 743, 775.)

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


CASTILLO, J.